**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**

**CIVIL ACTION NO. 2:19-00148 (WOB-CJS)**


**MICHAEL ALBIN**                                           **PLAINTIFF**

**VS.**               <u>**MEMORANDUM OPINION AND ORDER**</u>

**DR. DAVID W. SUETHOLZ, ET AL.**                          **DEFENDANTS**


This is a Section 1983 action arising out of allegations that the plaintiff received inadequate medical care during his incarceration at the Kenton County Detention Center ("KCDC").

This matter is currently before the Court on the motions for summary judgment by defendants James Smith, Jason Russell, Chuck Hopple, Patrick Ryder, Charles Schadler[1], Feliciano Velasco, Andrew Hamilton, and Jeffry Tillinghast (collectively "the KCDC defendants"). (Doc. 40).[2]

The Court previously heard oral argument and took the matter under submission. (Doc. 56). After further study, the Court now issues the following Memorandum Opinion and Order.

---

[1] This defendant's last name was apparently misspelled in the Complaint as "Schandler," and it is thus so spelled in the docket. However, elsewhere in the record, including in his deposition and the parties' briefs, his last name is spelled "Schadler."

[2] Plaintiff also sued three employees/contractors of Southern Health Partners, Inc., the entity that contracts with the KCDC to provide medical care to inmates. (Doc. 1). However, those defendants reached a settlement with plaintiff. (Doc. 54).

*Factual and Procedural Background*

**A. <u>Introduction</u>**

Albin was diagnosed with Type 1 diabetes in 2012. (Doc. 40-2 at 22:3-4). This requires him to check his sugar daily. (*Id.* at 21:7-8). Albin took Lantus insulin 12 units twice daily and fast-acting Humalog insulin with his meals. (Doc. 44-6 at 3).

In November 2018, Albin was arrested for a parole violation and sentenced to four consecutive weekends at KCDC. (Doc. 40-2 at 16:16-18). The pertinent events concerning the KCDC's motion for summary judgment took place over the course of sixteen hours during Albin's first weekend on November 16-17, 2018.

**B. <u>Self-Surrender and Booking</u>**

Albin was scheduled to self-surrender himself to KCDC's custody on Friday, November 16 at 6:00 p.m. (*Id.* at 18:6-10). Before arriving at KCDC, however, Albin went to McDonalds for dinner around 5:00 p.m. (*Id.* at 20:13-14). Albin took his insulin and checked his sugar in the jail parking lot, perceiving nothing to be of issue before he entered the jail. (*Id.* at 20:17-20).

Albin disclosed at booking that he was a diabetic. (*Id.* at 25:8-9). Booking officer Stephanie Bell took Albin's information and classified him as a "weekender." (Doc. 44-1). Albin did not inform the intake unit, or anyone else, of any medical issues at booking, so he was assigned and taken to dorm 102. (Doc. 44-2).

At approximately 7:00 or 7:30 p.m., Albin started to feel ill and thought he might have food poisoning from the chicken sandwich he consumed before entering jail, but he did not tell a corrections officer. (Doc. 40-2 at 34:24-35:17). Instead, he lay down in his assigned bed, located near the front of the dorm. (*Id.*)

Albin estimates that he began to vomit around 9:00 or 10:00 p.m.[3] (*Id.* at 42:5-8). Around 10:00 to 11:00 p.m., Albin's condition worsened, and he alleges that informed a corrections officer—at some unidentified point—that he needed medical attention. (*Id.* at 43:15-19). Albin believes the guard reported his condition to the medical staff. (*Id.* at 44:23-45:2). From this point forward, it is unclear what occurred until Albin was seen by Nurse Jessica Razor at 3:17 p.m. on November 17.

Nurse Michael Vandergraff worked the late shift on Friday night from 6:00 p.m. until 6:00 a.m. (Doc. 40-3 at 7). Diabetics were scheduled to have their blood sugar taken between 3:00 to 5:00 a.m. (*Id.* at 13-14). The inmate tracking logs provide that Albin left his dorm at 4:48 a.m. to get his blood sugar checked and receive his insulin. (Doc. 40-4).

Nurse Jessica Razor began her shift on November 17 at 7:00 a.m. (Doc. 40-5 at 9:8-12). Nurse Razor was on post in Albin's dorm at 9:00 a.m. on November 17, but Albin did not request medical

---

[3] A nurse visited the dorm at 9:15 p.m., but Albin stated that he did not tell the nurse about his nausea. (Doc. 40-2 at 140:19-23).

3

assistance. (*Id.* at 21:7-10). Later that day, Nurse Razor received a call that Albin was complaining of nausea. (*Id.* at 19-20).

Albin informed Nurse Razor that he was vomiting blood. (*Id.* at 6:19-25). She also discovered that Albin's blood sugar was high at 543, so she called Dr. David Suetholz, who instructed her to administer fifteen units of regular insulin and give him four milligrams of Zofran. (*Id.* at 6:19-7:10). Nurse Razor also requested Albin be placed in medical isolation so he could be monitored. (*Id.* at 7:11-14).

Nurse Razor did another check of Albin at 6:41 p.m., where she noted that his blood sugar had dropped to 278. (*Id.* at 8:14-17). Albin also stated that the Zofran had helped his nausea. (Doc. 40-2 at 98). But the pain did not subside for long. Dr. Suetholz eventually requested that Albin be transported to Saint Elizabeth Hospital around midnight on November 18. (Doc. 40-7 at 2). Albin remained in the hospital until November 21. (Doc. 40-2 at 111).

C. **Procedural History**

On October 22, 2019, Albin filed his complaint against the KCDC defendants and the medical defendants, asserting only a deliberate indifference claim against them in their individual capacities.[4] (Doc. 1). On December 6, 2019, the medical defendants

---

[4] Albin does not assert any official capacity or negligence claims.

4

filed their answer, (Doc. 5), and the KCDC defendants filed their answer on January 7, 2020, (Doc. 8).

The KCDC defendants have now moved for summary judgment. (Doc. 40). Albin states that he is limiting his claim against the KCDC defendants to the period before he was seen by Nurse Razor on November 17, 2018 at 3:17 p.m. (Doc. 44 at 4).

### *Analysis*

Albin asserts only an Eighth Amendment deliberate indifference claim against each defendant in their individual capacities, pursuant to 42 U.S.C. § 1983. (Doc. 1). Albin concedes that Deputy Schadler and Deputy Hamilton should be dismissed from this matter. (Doc. 44 at 1). Therefore, summary judgment is appropriate for these defendants.

This leaves his individual capacity claims against Sergeant James Smith, Sergeant Jason Russell, Sergeant Chuck Hopple, Deputy Patrick Ryder, Deputy Feliciano Velasco, and Deputy Jeffrey Tillinghast.

To state a prima facie claim under Section 1983, plaintiffs must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law. *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006). Only the first element is at issue here.

5

A defendant sued in their individual capacity is entitled to qualified immunity unless the facts would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019). Courts are permitted to "exercise their discretion in decid[ing] which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

### A. No Constitutional Violation

The first issue is whether any of the KCDC defendants violated Albin's Eighth Amendment rights.

To state an Eighth Amendment claim regarding medical care, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to the plaintiff's serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). This has been interpreted to mean that plaintiffs must establish an objective and subjective component to be successful. *Wilson v. Seiter*, 501 U.S. 294 (1991); *see also Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992).

Because the KCDC defendants do not contest the objective component, (Doc. 40 at 6), the only question is whether Albin can establish the subjective component.

The subjective component requires a showing that "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded it." *Cornstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan*, 511 U.S. 825, 838 (1994). Plaintiffs may provide direct or circumstantial evidence from which the Court can infer that the prison official had the requisite knowledge. *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

Albin argues that a reasonable jury could find that the KCDC defendants learned about his condition but delayed communicating this information to the medical staff for approximately sixteen hours. (Doc. 44 at 9).

Albin argues that each of the KCDC defendants would have heard, seen, or learned about his condition at various points of the night and early morning but took no action to notify the medical unit until 3:17 p.m. on November 17. (*Id.* at 18). He argues that Nurse Michael Vandergraff was on duty when he arrived on November 16, along with Nurse Jessica Razor the next day, but neither was informed of his condition until 3:17 p.m. on November 17. (*Id.* at 19-20).

7

These allegations must be considered separately as to each of the remaining six KCDC defendants.

### i. **Deputy Tillinghast**

On November 16, 2018, Deputy Tillinghast was assigned to Albin's cell in dorm 2 from 3:00 p.m. to 11:00 p.m. (Doc. 40-11 at 9:1-5). Deputy Tillinghast does not recall Albin asking for medical attention during his post, (*Id.* at 9:23-10:1), but he does concede that he would have performed a headcount at the conclusion of his shift.[5] (*Id.* at 15:3-10).

Albin urges the negative inference that, given the lack of documentation in conjunction with Deputy Tillinghast's headcount at 11:00 p.m. on November 16 (around the time Albin began exhibiting severe symptoms), a reasonable jury could conclude that Tillinghast learned of Albin's condition and failed to report it to the medical unit. (Doc. 44 at 15). This argument is unavailing.

Albin relies on two cases. First, in *Garretson v. City of Madison Heights*, 407 F.3d 789, 794 (6th Cir. 2005), the Court held that there was sufficient evidence for a reasonable jury to conclude that two correction officers were deliberately indifferent to the plaintiff's need for insulin because they held

---

[5] Deputy Tillinghast's second shift occurred the next day in dorm 103, not in Albin's dorm, from 3:00 p.m. until 11:00 p.m. (Doc. 40-11 at 7:16-19).

the plaintiff in an overnight cell without administering her insulin, even after they learned that she was a diabetic.

Second, in *Naphier v. County of Genesee*, No. 11-13754, 2012 WL 6652945, at *10 (E.D. Mich. Dec. 21, 2012), the district court held that two correction officers were deliberately indifferent after they learned about the plaintiff's need for insulin at booking and saw her shaking, sweating, and vomiting after she had not received her insulin dose after eight hours.

Unlike those cases, nothing in the record here indicates that Deputy Tillinghast was subjectively aware of Albin's alleged condition because Albin entered the dorms in the middle of his shift. Albin had also taken his insulin just prior to checking himself into KCDC. (Doc. 40-2 at 27:23-28:2).

Albin also told the booking officer that he did not need medical attention at the time he turned himself in. (*Id.* at 139-140). By Albin's own timeline, he became nauseous only toward the end of Deputy Tillinghast's shift at 11:00 p.m. (Doc. 40-2 at 43:15-19).

According to Deputy Tillinghast, his shift took place before "lights out" for the inmates, which means if an inmate was frequenting the restroom—as Albin alleges—then it would be difficult for him to notice with inmates walking around. (*Id.* at 10:19-11:5). There were also no notations in the pass down logs ("PDLs"), the deputies handwritten logs detailing matters that

9

have occurred, to indicate that Albin sought medical attention during Deputy Tillinghast's shift. (*Id.* at 12:24-13:2). Therefore, Deputy Tillinghast is entitled to qualified immunity.

### ii. Sergeant Russell

Sergeant Russell was the shift commander when Deputy Tillinghast completed final headcount on Friday, November 16, 2018. During each shift, an officer, like Sergeant Russell, is designated as the officer in charge. The officer in charge oversees deputies, who are assigned to a cell, and tours the cells as part of their duties.[6]  (Doc. 40-8 at 14:21-15:4).

Albin argues that a reasonable jury could make the negative inference that since Sergeant Russell's preference is for deputies to inform him about inmates that are seeking medical care, the jury could find that Deputy Tillinghast told Sergeant Russell about Albin's medical condition, and Sergeant Russell determined that Albin did not need medical attention. (Doc. 44 at 15). This argument is not supported by the record.

"At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Hays v.*

---

[6] Sergeant Russell was also the commander in charge when Deputy Hamilton and Deputy Schadler were assigned to Albin's dorm the next day, (Doc. 40-17 at 11:17-20), but Sergeant Russell denies that he had a conversation with them about Albin's medical condition, (*Id.* at 11:17-24). Albin has also conceded that Deputy Hamilton and Deputy Schadler were not culpable. (Doc. 44 at 1).

*Jefferson Cty*, 668 F.2d 869, 874 (6th Cir. 1982). If a plaintiff fails to show that a subordinate engaged in unconstitutional conduct, then the court may not hold the supervisor liable. *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006).

For the reasons stated above, nothing in the record indicates that Deputy Tillinghast knew that Albin was suffering from a severe medical condition. Thus, Sergeant Russell cannot be liable. *McQueen*, 433 F.3d at 470. Therefore, he is likewise entitled to qualified immunity.

### iii. **Deputy Velasco**

On November 16, 2018, Deputy Velasco was scheduled to work in dorm 6, not Albin's dorm, from 11:00 p.m. until 7:00 a.m. (Doc. 40-12 at 8:11-16). At approximately 12:08 a.m. on November 17, Deputy Velasco covered a fifteen-minute break for Deputy Klopfer in dorm 2. (*Id.* at 9:1-4). While in dorm 2, Deputy Velasco stated that Albin told him about his medical condition and that he informed Sergeant Hopple and someone in the medical unit about Albin's medical condition. (*Id.* 7:3-20). Sargent Hopple denies any recollection of Deputy Velasco informing him about Albin's medical condition. (Doc. 40-8 at 18:9-13).

Albin argues that despite allegedly telling Sergeant Hopple about his serious medical condition, Deputy Velasco never informed the medical unit about Albin's condition. (Doc. 44 at 16). Albin's argument is unavailing.

Deputy Velasco testified that Albin told him that he was vomiting blood, but Albin did not tell Deputy Velasco that he thought he was experiencing diabetic ketoacidosis. (Doc. 40-12 at 7:8-15, 15:8-12). Deputy Velasco told Albin that he would get help. (*Id.* at 7:16-20). Albin conceded in his deposition that he thought "the guard reported" his condition to the medical staff. (Doc. 40-2 at 44:23-45:2). Indeed, Deputy Velasco testified that he told both Sergeant Hopple and someone in the medical unit about Albin vomiting.[7] (Doc. 40-12 at 14:19-20).

After providing this notice, Deputy Velasco returned to dorm 6 after Deputy Klopfer returned from his break. Thus, there is no evidence that Deputy Velasco knew of and disregarded a substantial risk of harm to Albin's safety because he reported the condition while covering Deputy Klopfer's break. *Garretson*, 407 F.3d at 797. Therefore, Deputy Velasco is entitled to qualified immunity.

### iv. **Sergeant Hopple**

Sergeant Hopple was the officer in command from 11:00 p.m. on November 16 until 7:00 a.m. on November 17, following Sergeant Russell's shift as commander in charge. (Doc. 40-8 at 18:22-19:2). Sergeant Hopple visited dorm 2 at 12:50 a.m. on November 17. (*Id.* at 15:9-17).

---

[7] Nurse Vandergraff stated that he went to dorm 2, and Albin refused medical attention. (Doc. 40-3 at 8:9-14). It is unclear, even with Nurse Vandergraff's testimony, when this alleged refusal would have occurred.

12

Albin argues that Hopple was on notice both because of Velasco's statement and seeing that Albin needed medical attention. (Doc. 44 at 16). Both arguments fail.

Unlike *Garretson* and *Naphier*, where the correction officers were directly informed about the plaintiff's insulin requirement, there is no evidence that Sergeant Hopple knew that Albin was a diabetic or that he needed his insulin at that time. Instead, Deputy Velasco only told Sergeant Hopple that Albin was vomiting blood. (Doc. 40-12 at 7:10-20). But since Sergeant Hopple was performing his security tours at other dorms, Sergeant Hopple directed Deputy Velasco to contact medical, which Deputy Velasco testified he did. (*Id.* at 9:18-22). When Sergeant Hopple arrived on post in dorm 2 at 12:50 a.m., (Doc. 40-10 at 2), he stated that he did not see an inmate frequenting the restroom and nobody told him that medical attention was needed for an inmate. (Doc. 40-8 at 25:9-13).

 Sergeant Hopple stated that inmates can fill out sick calls if they need medical attention. (*Id.* at 21:23-22:4). Albin concedes that he never made such a request. (Doc. 40-2 at 40:8-18). Moreover, Albin never informed medical of his alleged concerns about diabetic ketoacidosis when he had his blood sugar tested at 5:00 a.m. on November 17. (Doc. 40-10 at 3). Thus, there is no genuine issue of material fact to suggest that Sergeant Hopple knew of or learned about Albin was at risk of diabetic

13

ketoacidosis. Sergeant Hopple is thus entitled to qualified immunity.

### v. **Deputy Ryder**

Deputy Ryder was on shift at dorm 2 from 7:00 a.m. until 10:57 a.m. on November 17. (Doc. 40-14 at 9:1-3, 15:16-18, 16:1-4). Deputy Ryder conducted a headcount when he started his shift, which required inmates to go to their assigned space in the dorms so the deputy could check all the inmates' wristbands to ensure they were in the correct location. (*Id.* at 18:6-19:22). He also passed out trays for lunch at 10:57 a.m. before he left for lunch. (*Id.* at 10:15-18). Deputy Ryder stated that all inmates had to get their own trays, and he did not make an exception. (*Id.* 10:19-11:5). This requires all inmates to come to the front of the dorm to get their trays. (*Id.* at 12:2-9). Deputy Ryder took his lunch shortly after the inmates began theirs and was scheduled for another dorm when he returned. (*Id.*)

Because Albin claims that he was vomiting every fifteen minutes, he argues that Deputy Ryder would have seen his condition and he did not report it to the medical staff. (Doc. 44 at 17). This argument is not well-taken.

First, speculation is not enough to meet the heightened deliberate indifference standard. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) ("It is not enough that there was a danger of which an officer should objectively have

14

been aware."). In other words, it is not enough that Deputy Ryder should have known that Albin was at risk of ketoacidosis; rather, plaintiff must show that Deputy Ryder *did* know of his serious medical condition. *Id.*

Second, the records indicate that Albin was seen by the medical staff at 5:00 a.m., when he got his blood sugar checked and received his insulin. (Doc. 40-10 at 2). It is unclear whether he informed the medical unit about his concern about whether he was going through diabetic ketoacidosis.

Third, the PDL indicates that during Deputy Ryder's shift, the medical unit conducted their visit to dorm 2 at 9:00 a.m. until 9:09 a.m. (Doc. 40-10 at 3). Deputy Ryder testified that inmates are permitted to fill out sick calls during the medical unit's visit, but Albin did not alert the medical staff about his alleged condition. (Doc. 40-14 at 10:12-14). Nor did any inmates alert Deputy Ryder about Albin vomiting. (*Id.* at 13:9-11). Therefore, Deputy Ryder is entitled to qualified immunity.

### vi. **Sergeant Smith**

Sergeant Smith was also scheduled to be an officer in charge on November 17 from 3:00 a.m. until 3:00 p.m. with Sergeant Hopple.[8] (Doc. 40-13 at 7:18-21). He conducted two security tours in dorm

---

[8] Sergeant Smith explained that it was possible that he was either scheduled with Sergeant Hopple to finish his shift or help out during the shift. (Doc. 40-13 at 8:1-4).

2 during his shift, one at 8:28 a.m. and one at 12:34 p.m. (Doc. 40-10 at 3). Sergeant Smith testified that he was not informed by Sergeant Hopple or the deputies, nor did he observe, that Albin was vomiting during his shift. (Doc. 40-13 at 10:7-13, 27:5-9).

Albin argues that Sergeant Smith did not contact the medical department after he learned of Albin's medical condition. (Doc. 44 at 17-18). This argument fails.

The record indicates that Albin was seen by the medical staff a couple hours after Sergeant Smith's shift began at 3:00 a.m. (Doc. 40-10 at 2). Unlike Sergeant Hopple, there is no evidence to suggest that Sergeant Smith learned about Albin's insulin dependence or his alleged deteriorating condition.

During Sergeant Smith's security tours, he testified that he does not recall seeing Albin or being informed by the deputy or inmates about his condition. (Doc. 40-13 at 10:7-13). The PDL also indicates that medical was in dorm 2 at 9:00 a.m., thirty minutes after Sergeant Smith left dorm 2 on his security tour. (Doc. 40-10 at 3). Sergeant Smith stated that Albin was free to inquire with the medical staff about his condition when medical was in the dorm. (Doc. 40-13 at 26:17-21). Thus, like Sergeant Russell, he cannot be held liable. *McQueen v. Beecher Cmty. Schs.*, 433 F.3d at 470.

Moreover, Sergeant Smith also testified that he had a conversation with Albin after the lawsuit was filed, and Albin

16

told him that he did not think that Sergeant Smith did anything wrong. (*Id.* at 17:1-18). Because Albin has not shown that Sergeant Smith authorized any unconstitutional behavior, knowingly or implicitly, he cannot be held liable. *Hays*, 668 F.2d at 874. Therefore, Sergeant Smith should be granted qualified immunity.

**B. No Violation of Clearly Established Law**

"Whether an official protected by qualified immunity may be held personally liable for an alleged unlawful official action generally turns on the objective legal reasonableness of the action . . . assessed in light of the legal rules that were clearly established at the time it was taken." *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1094 (6th Cir. 1992) (internal quotations omitted). "[W]here the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such ad constitutes [a constitutional] deprivation." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 552 (6th Cir. 2009) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005)).

The parties agree that it is clearly established law that a diabetic plaintiff cannot be deprived of insulin while in custody and experiencing symptoms related to diabetes. *Garretson*, 407 F.3d at 798.

In *Garretson*, the Sixth Circuit held that the two correction officers violated clearly established law because they knew the

17

plaintiff was an insulin-dependent inmate who was past due for her treatment. *Id.* The same is not true here.

Albin does not dispute that he took his insulin before he arrived at the jail, and his blood sugar was normal. (Doc. 40-2 at 20:17-20, 27:23-28:2). Albin also concedes that the booking officer asked him if he needed any medical attention when he arrived, but he told them that he felt fine. (*Id.* at 139-140). Albin received his insulin and had his blood sugar checked at 5:00 a.m. on November 17. (Doc. 40-10 at 3). Thus, he had ample opportunities to bring his concerns to medical when they came to the dorms. *See* (*Id.*)

In sum, Albin received his therapeutic insulin before and during the relevant times alleged against the KCDC defendants. Therefore, even if some or all the *medical* defendants violated his Eighth Amendment rights, an issue that is not before the Court because the medical defendants have settled with Albin, the KCDC defendants have not violated any clearly established law due to any delay in Albin receiving his medication.[9] *See Sours v. Big Sandy Regional Jail Authority*, 593 F. App'x 478, 487 (6th Cir. 2014).

---

[9] Albin has not challenged any policy of the jail. Therefore, the correction officers were permitted to adhere to advice and schedules that medical staff set up for its inmates. *Winkler v. Madison Cty*, 893 F.3d 877, 895 (6th Cir. 2018).

18

Therefore, having reviewed this matter, and the Court being advised,

**IT IS ORDERED** that defendants' motion for summary judgment (Doc. 40) be, and is hereby, **GRANTED**. A separate judgment shall enter concurrently herewith.

This 4th day of October 2021.



Signed By:

***William O. Bertelsman*** WOB

**United States District Judge**